**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.  08-CR-26-JHP |
| | ) | |
| MELVIN LOUIS BAILEY, JR., a/k/a | ) | |
| "Ojo," | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

Before the Court for report and recommendation is the Motion to Suppress Evidence filed

by Defendant Melvin Louis Bailey, Jr. ("Bailey").  (Dkt. #15).  The motion came on for hearing

on March 25, 2008 and continued on April 17, 2008.  The parties filed supplements to their

briefs on April 24, 2008.  The matter is now at issue.

The parties presented the testimony of eleven witnesses: Officer Jason Muse ("Muse"),

the affiant of the search warrant affidavit at issue; Officer Matt Snow ("Snow"), Muse's partner,

Felicia Witherspoon ("Witherspoon"), the informant upon whose information the search warrant

was based; Genevieve Bailey, Bailey's mother; Elgin Scott, Bailey's co-manager of Club

Fahrenheit; Tiara Crawford, Bailey's girlfriend; Larry Edwards, Bailey's attorney in the state

court proceedings; Brian Breman, an employee of Parkhills Liquors and Wines; Thomas Mahan

("Mahan"), a house construction and remodeling contractor with whom Bailey worked as a

subcontractor; and Officers Ronny Leatherman and Dale Francetic, the officers who executed the

subject search warrant.  Admitted exhibits included the search warrant affidavit (Def. Ex. 2),

photographs of the house at 2304 N. Boston Pl. that was searched (Def. Ex. 1 and Govt. Exs. 1-

2), photographs of the house and truck at 205 Mohawk Blvd. (Def. Exs. 6-8), invoices for

Bailey's construction jobs (Def. Exs. 9-10), invoice of liquor purchase from Parkhills Liquors and Wines, dated 11/24/08 at 18:04 (Def. Ex. 5), Muse's notes of his encounter with Witherspoon (Def. Ex. 4), and a record of TRACIS inquiries on Witherspoon (Govt. Ex. 3).

On February 6, 2008, Bailey was indicted for possession of cocaine and cocaine base with intent to distribute and maintaining a drug-involved premises as a result of the search of his unoccupied residence at 2304 North Boston Place on December 4, 2007 ("the search").  The search yielded 317 grams of cocaine base and 390 grams of cocaine.  Bailey contends that the evidence seized as a result of the execution of the search warrant issued on November 26, 2007 ("the search warrant") should be suppressed on the following grounds: (1) the search warrant is facially defective, (2) it fails to establish probable cause for the search because the search warrant relies on the illegal seizure of $4500 in cash and the diagram of a hidden compartment by police in a prior encounter with Bailey and information that is false or given in reckless disregard for the truth, and (3) it is stale.

## I.    Description of the place to be searched.

Bailey contends that the search warrant is insufficient because the description of the house to be searched is incorrect.  The warrant describes the place to be searched as follows:

> THE STRUCTURE TO BE SEARCHED IS A SINGLE STORY RESIDENCE LOCATED ONE-HOUSE NORTH OF EAST XYLER STREET NORTH, ON THE WEST SIDE OF NORTH BOSTON PLACE.  THE RESIDENCE TO BE SEARCHED HAS A SLOPED BROWN COMPOSITION SHINGLE ROOF. THE RESIDENCE IS CONSTRUCTED OF BRICK PAINTED TAN.  THE RESIDENCE TO BE SEARCHED HAD NO VISABLE [SIC] HOUSE NUMBERS ON THE EAST SIDE OF THE RESIDENCE.  THE FRONT DOOR IS ON THE EAST SIDE OF THE HOUSE AND FACES EAST.  A GLASS STORM DOOR SHROUDS THE FRONT DOOR.  THIS ADDRESS IS MORE COMMONLY KNOWN AS 2304 NORTH BOSTON PLACE, CITY AND COUNTY OF TULSA, STATE OF OKLAHOMA.

*Exhibit to Defendant's Motion to Suppress Evidence.*  Bailey notes, and the photographs confirm, that the house at 2304 N. Boston Place is constructed of tan stucco, not tan painted brick, and the roof is light-colored, rather than brown. Bailey also points out that the warrant describes a glass storm door rather than a door with heavy bars and fails to mention the surveillance cameras which are visible from the street.  Given these discrepancies and because Muse, the affiant, did not accompany the executing officers, Bailey argues there is a question of whether the executing officers reasonably may have searched the wrong property.

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and *particularly describing the place to be searched* and the persons or things to be seized." U.S.Const. amend. IV (emphasis added).  "'The test for determining the adequacy of the description of the location to be searched is whether the description is sufficient to enable the executing officer to locate and identify the premises with reasonable effort, and whether there is any reasonable probability that another premise might be mistakenly searched.' " *United States v. Lora-Solano,* 330 F.3d 1288, 1293 (10th Cir.2003) (quoting *United States v. Pervaz*, 118 F.3d 1, 9 (1st Cir.1997)).

The Court concludes that the description of the location to be searched is sufficient.  The search warrant and affidavit accurately describe the location and street address of the house, the direction it faces and the color.  There is an outside front door with bars and a frame of glass or plastic that could be described as a storm door.  And although the roof is light-colored and appears gray, it is accurately described as a sloped composition shingle roof. "Practical accuracy rather than technical precision controls the determination of whether a search warrant adequately describes the premises to be searched."  *United States v. Dorrough*, 927 F.2d 498, 500 (10th Cir.

1991); *Harmon v. Pollock*, 446 F.3d 1069 (10th Cir. 2006) ("We have upheld warrants like the one at issue where one part of the description is inaccurate, but the description has other accurate information to identify the place to be searched with particularity."); *Lora-Solano*, 330 F.3d at 1294 ("A technically wrong address does not invalidate a warrant if it otherwise describes the premises with sufficient particularity so that the police can ascertain and identify the place to be searched.").  In addition, Muse testified that he had surveilled the residence within 72 hours of seeking the search warrant and verified from police records that Bailey resided at that address. Further, the executing officer, Officer Ronny Leatherman, testified that he had no problem locating the house from the description and the address and that Muse had also instructed him as to its location the previous week.  Finally, there is no evidence establishing a reasonable probability that another premise might be mistakenly searched.

## II.    Probable Cause for the Search Warrant

The search warrant was issued by Judge Cliff Smith in the District Court for Tulsa County, State of Oklahoma on November 26, 2008 at 3:03 PM.[1] based on the information set forth in Muse's affidavit.   Bailey argues that the evidence secured from the execution of that search warrant must be suppressed because the affidavit fails to establish probable cause to search Bailey's residence.

As noted above, the Fourth Amendment requires "probable cause" before a search warrant may be issued.  To determine whether probable cause exists to support a search warrant, a magistrate judge must simply "make a practical, common-sense decision whether, given all the

---

[1] The actual date on the search warrant and affidavit is November 26, 2006.  Muse explained that the 2006 year was mistakenly carried over from a previous form.

4

circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The magistrate judge's decision to issue a warrant is entitled to "great deference." *Id*. at 236. Thus, the Court "need only ask whether, under the totality of the circumstances presented in the affidavit, the magistrate judge had a 'substantial basis' for determining that probable cause existed." *United States v. Artez*, 389 F.3d 1106, 1111 (10th Cir. 2004); *Gates*, 462 U.S. at 238-39.

### A.    Burden of proof

The burden of proof in a suppression motion is a preponderance of the evidence standard. *Lego v. Twomey*, 404 U.S. 477, 488-89 (1974); *United States v. Matlock*, 415 U.S. 164, 178 n. 14 (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence."). It is well established that the burdens of production and persuasion generally rest upon the movant in a suppression hearing if the search or seizure was carried out pursuant to a warrant. *United States v. Esser*,  451 F.3d 1109, 1112 (10th Cir. 2006). Thus, it is Bailey's burden to prove that there is no probable cause for the issuance of the search warrant.   However, if "the police acted without a warrant, the burden of proof is on the prosecution." *Id*.  One such situation is here where the defendant alleges that he did not consent to the warrantless search of his person or car when Muse, Snow and other officers stopped him at 205 Mohawk and thus, the "fruits" of that illegal search, $4500 and a diagram of how to make a hidden compartment in the bed of a pickup truck, cannot be used as supporting evidence to secure the search warrant. *United States v. Ringold*, 335 F.3d 1168, 1171

(10th Cir. 2003) ("[W]henever the government relies on a defendant's consent to validate a search it bears the burden of proving the consent valid."); *United States v. McRae*, 81 F.3d 1528, 1536-37 (10th Cir. 1996) ("If the government seeks to validate a search based on consent, the government bears the burden of proving that the consent was freely and voluntarily given.").

### B.    Prior encounter

In his affidavit in support of the search warrant, Muse attested to the following regarding a prior encounter with Bailey at 205 Mohawk Blvd ("205 Mohawk"):

> YOUR AFFIANT STOPPED MELVIN BAILEY JUNIOR AT 205 MOHAWK BLVD PREVIOUSLY, AND THAT HE HAD APPROXIMATELY 4500 DOLLARS IN CASH ON HIM, AND A DIAGRAM OF HOW TO MAKE A HIDDEN COMPARTMENT INSIDE THE BED OF A PICKUP TRUCK INSIDE HIS BLACK LEXUS.  MELVIN BAILEY JUNIOR TOLD YOUR AFFIANT DURING THIS ENCOUNTER THAT HE WAS SELF-EMPLOYED. . . . YOUR AFFIANT WAS TOLD DURING A CONSENTUAL [SIC] ENCOUNTER WITH MELVIN BAILEY JUNIOR THAT HE IS THE SOLE OCCUPANT AT 2304 NORTH BOSTON PLACE.

Defendant's Ex. 2.   Bailey asserts that the evidence from this illegal search cannot be considered in determining whether the affidavit established probable cause for the search of his residence. *Mapp v. Ohio,* 367 U.S. 643, 656 (1961) ("Any evidence obtained as a result of an illegal search and seizure is subject to the exclusionary rule - i.e., the evidence cannot be used in a criminal proceeding against the victim of the illegal search and seizure."); *Wong Sun v. United States*, 371 U.S. 471, 485 (1963) ("[V]erbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest . . .is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion.").  The government responds that the search was not illegal as it was the result of a consensual encounter between Muse and Bailey.

The Tenth Circuit has identified three kinds of police-citizen encounters:

> (1) consensual encounters which do not implicate the Fourth Amendment;
> (2) investigative detentions which are Fourth Amendment seizures of limited
> scope and duration and must be supported by a reasonable suspicion of criminal
> activity; and (3) arrests, the most intrusive of Fourth Amendment seizures and
> reasonable only if supported by probable cause.

*United States v. Torres-Guevara*, 147 F.3d 1261, 1264 (10th Cir. 1998) (internal quotation marks

and brackets omitted).  It is undisputed that this encounter did not result in arrest or recovery of

the currency or diagram.  Bailey, however, contends the encounter was an investigative detention

entitling him to Fourth Amendment protection, while the government claims that the encounter

was consensual and thus not a seizure under the Fourth Amendment.  As noted above, it is the

government's burden to prove the consensual nature of the encounter.

 To determine whether the encounter is a seizure entitled to Fourth Amendment

protection,

> a court must consider all the circumstances surrounding the encounter to
> determine whether the police conduct would have communicated to a reasonable
> person that the person was not free to decline the officers' requests or otherwise
> terminate the encounter.

*Florida v. Bostick*, 501 U.S. 429, 439 (1991).  The inquiry is an objective one. *Ringold*, 335 F.3d

at 1172.  "As long as a reasonable innocent person, as opposed to a person knowingly carrying

contraband, would feel free to leave, such encounters are consensual and need not be supported

by reasonable suspicion of criminal activity." [2] *United States v. Laboy*, 979 F.2d 795, 798 (10th

---

[2] The Supreme Court adopted the "reasonable person" test, which presupposes an *innocent* person, to ensure "that the scope of Fourth Amendment protection does not vary with the state of mind of the particular individual being approached."  *Michigan v. Chesternut*, 486 U.S. 567, 574 (1988).  Some commentators have criticized the "reasonable person" concept applied to search and seizure as fictional, with no basis in reality.  *See, e.g.,* Daniel J. Steinbock, *The Wrong Line Between Freedom and Restraint: The Unreality, Obscurity, and Incivility of the Fourth Amendment Consensual Encounter Doctrine*, 39 San Diego L. Rev. 507 (Spring 2001).  Steinbock observes that this "reasonable person" standard is "simply out of touch with societal reality.  Briefly put, most people have neither the knowledge nor the fortitude to terminate unwanted interactions with the police."  *Id*. at 522.  He notes that if this "reasonable

Cir. 1992) (citing *Bostick*, 501 U.S. at 434).  The Tenth Circuit has identified a nonexhaustive

list of factors to consider under this "reasonable person-totality of the circumstances" test:

> 1) the threatening presence of several officers; 2) the brandishing of a weapon by
> an officer; 3) some physical touching by an officer; 4) use of aggressive language
> or tone of voice indicating that compliance with an officer's request is
> compulsory; 5) prolonged retention of a person's personal effects such as
> identification and plane or bus tickets; 6) a request to accompany the officer to the
> station; 7) interaction in a nonpublic place or a small, enclosed place; and 8)
> absence of other members of the public.

*Ringold*, 335 F.3d at 1171 (numbers added); *United States v. Hill*, 199 F.3d 1143, 1147-48 (10th

Cir. 1999).  Additional factors include whether the officer advised the defendant that he need not

cooperate and was free to leave. *Torres-Guevara*, 147 F.3d at 1264-65.  None of these factors is

dispositive, "nor should they be treated as exclusive, and it may be that the strong presence of

two or three factors demonstrates that a reasonable person would have believed that he was not

---

person resembles any real human being, it is a white, middle-class, educated professional - just like most
members of the [Supreme] Court itself."  *Id*. at 526.

    This same criticism was lodged by Judge McKay in *United States v. Williams,* 356 F.3d 1268
(10th Cir. 2004) (McKay J., dissenting) where he recognized that the judge's subjective interpretation of
this "objective" standard results in "differing judgments about the response of the judicially defined
'innocent' person."  *Id*. at 1276 ("The reasonable person of our case law has historically come from the
minds and experience of judges, not from the record.").  In *Williams*, Judge McKay disagreed with the
majority's holding that there was no seizure of the defendant although a drug-detection dog "placed her
nose in the immediate vicinity of [the defendant's] waist and groin area."  *Id*. at 1276.

> When, as in this case, a drug dog shoves its nose in a person's groin, and the person is
> told that the dog is searching for drugs, the notion that an innocent person would not feel
> constrained-but free to leave unmolested-strains my credulity. . . .
> At the very least, before we declare such encounters "reasonable," or free from seizure
> implications, we ought to be informed of how widespread the fear of dogs, far short of
> cynophobia, is among reasonable and innocent persons. While the "reasonable person"
> and the "innocent person" are legal fictions created by the courts, before we settle the
> matter, we ought at least to examine what can be known of common human behavior
> before we ratify police dog handler behavior which on its face seems repugnant.

*Id*; *see also United States v. Little*, 18 F.3d 1499, 1508 (10th Cir. 1994) (Logan J., with whom Seymour J.
and McKay J. join, dissenting) ("There apparently are no empirical studies of how a reasonable person, a
reasonable innocent person, would react in similar circumstances.  The 'reasonable person' exists only in
the minds of the judges who adjudicate these matters.").

free to terminate an encounter with government officials." *Fuerschbach v. Southwest Airlines Co.*, 439 F.3d 1197, 1203 (10th Cir. 2006) (internal quotation marks omitted).  The "reasonable person-totality of the circumstances" test is necessarily imprecise, but the focus is on "the coercive effect of police conduct taken as a whole" on a reasonable person.  *Michigan v. Chesternut*, 486 U.S. 567, 573-74 (1988).

The evidence regarding this encounter consisted of the testimony of Muse, Snow and Mahan.  Muse testified that approximately two months before the search warrant was issued, he and three other officers in four police vehicles without their lights and sirens on pulled up to where a group of 10-15 black males were standing on the east side of the parking lot of a convenience store at 205 Mohawk.  Muse said that they approached the men because 205 Mohawk was known for narcotics sales and he had stopped two people conducting a hand-to-hand narcotics transaction in that same time period.  The officers approached the group without their guns drawn.  Bailey walked up to Muse and asked why they were bothering these people.  Muse decided to pat Bailey down immediately because Bailey approached him and the first thing he does in a high crime area is check for weapons.  Muse asked Bailey if he had any weapons on him; Bailey said no.  Muse then told him to turn around so he could check him for weapons.  While he was restraining both of Bailey's hands, Muse patted Bailey down and felt a bulge in his back pocket and asked him what it was.  Bailey responded that it was his wallet.  Muse testified that it seemed too big for a wallet and pulled the wallet out and went through it; he found $4500 in cash in the wallet.  Muse told Bailey that he shouldn't be carrying that much cash in this area and Bailey responded that people knew him there and no one would mess with him.  Muse asked for his name and Bailey told him his name and address and that he lived alone; Muse

remembered Bailey's address because he had heard from several people there was drug trafficking there.  Bailey told Muse that he was doing construction on the house next to the parking lot (and from this, Muse assumed that Bailey owned trucks).  Muse asked if the black Lexus belonged to him and if there were any weapons or explosives in the car.  Bailey said no and Muse asked if they could search the car.  Bailey consented and Muse told Snow to look in the vehicle.  Muse later found out that Snow had found a diagram of a hidden compartment to be placed in the bed of pickup trucks.  The encounter lasted approximately 15-20 minutes.  Muse characterized the encounter as consensual as he did not cuff Bailey and the encounter took place in a public area.  He stated that he did not tell anyone to sit on the retaining wall between the house and the parking lot, though they did.

Snow testified that the encounter at 205 Mohawk occurred a couple of weeks before their contact with Witherspoon and he was with Muse at the time.  Snow said that four officers approached in their vehicles, with police lights flashing and sirens on, 4-5 men who were mulling around in the parking lot near the retaining wall. He testified that Muse, and not he, talked to Bailey and he could not hear their conversation and did not hear Bailey give his address to Muse.  Muse told Snow that Bailey had given consent to search the black Lexus and Snow found the diagram of the hidden compartment on the floorboard of the car.  Defense counsel asked "Besides Bailey, where were these other citizens?" Snow responded that they were seated on the retaining wall and instructed to remain there until they were allowed to leave by the officers.  The encounter lasted 10-20 minutes.

Mahan testified that he had asked Bailey to meet him that day at 205 Mohawk to give him a bid on a roof for the house because Bailey had subcontracted for roofing for Mahan for the

last three years.  Mahan said he, Bailey and another guy named Sam who worked with Bailey were taking measurements around the house when four or five cop cars pulled up and approached Bailey and Sam and 5-6 other guys who were hanging out near the retaining wall. The officers told Bailey, Sam and the other men to sit on the retaining wall and remove their shoes and socks, which they did.  Except for this, Mahan said he did not hear any of the conversation between the officers and the men.  The officers searched everyone.  Mahan said he did not see the search of Bailey or his car as the officers did not call him over and so he continued to take measurements of the house, but when he came back around the house he saw that the police had Bailey's money.  He did not see the officer give the money back.  The encounter lasted 30-35 minutes.          Having weighed the evidence and the credibility of the witnesses, the Court makes the following findings.  Four uniformed officers in separate cars with their lights and sirens on approached 4-6 men who were congregated around the retaining wall between the house that Bailey was measuring for a new roof and the parking lot.  The officers told the men to sit on the retaining wall, to remove their shoes and socks, and to remain there until they were allowed to leave by the officers.  When Muse asked Bailey if he had any weapons on him; Bailey said no.  Muse then told him to turn around so he could check him for weapons.  Muse restrained both of Bailey's hands, while he patted Bailey down.  Muse felt a bulge in Bailey's back pocket and asked him what it was.  Bailey responded that it was his wallet.  Muse testified that it seemed too big for a wallet and so he pulled out the wallet and went through it; he found $4500 in cash in the wallet. Muse then asked if the black Lexus belonged to Bailey and if there were any weapons or explosives in the car.  Bailey said no and Muse asked if they could search the car.  Bailey said yes and Muse told Snow to look in the vehicle.  Snow

found a diagram of a hidden compartment to be placed in the bed of a pickup truck on the

floorboard of the car.  Neither the diagram nor the $4500 in currency was confiscated.  The

encounter lasted approximately 15-20 minutes.        Considering all the circumstances

surrounding the encounter, the Court concludes that a reasonable person would not believe that

he was free to leave and that the encounter was an investigative detention and not a consensual

encounter.  Although the encounter occurred in an open, public space and the officers did not

brandish their weapons, they exhibited a clear "show of authority" when, uniformed and armed,

they descended upon Bailey and the other men in four patrol cars with sirens on and lights

flashing.  *California v. Hodari D.*, 499 U.S. 621, 627-28 (1991).  In a further show of authority

the officers instructed Bailey and the other men to sit on the retaining wall and remove their

shoes and socks.  A reasonable person would not feel free to walk away under these conditions,

particularly barefoot.  Further, there is no testimony that Muse or any of the other officers

informed Bailey that he did not need to cooperate and was free to leave.  And when Bailey

answered that he did not have a weapon, Muse physically restrained Bailey's hands, while he

patted Bailey down and removed his wallet.  It is not surprising then that Bailey acquiesced in

Muse's request to search his car for explosives and weapons.  Contrary to the government's

argument, this is not a case in which the officers "merely approaching an individual on the street

or in another public place, . . . ask[] him if he is willing to answer some questions, [or] . . . put[]

questions to him if the person is willing to listen." *Florida v. Bostick*, 501 U.S. 429, 434 (1991).

Although no single factor is dispositive, the totality of the circumstances convinces the Court

that the police conduct here "'would have communicated to a reasonable person that the person

was not free to decline the officers' requests or otherwise terminate the encounter.'" *Gallegos v.*

12

*City of Colorado Springs*, 114 F.3d 1024, 1028 (10th Cir. 1997) (quoting *Bostick*, 501 U.S. at 439).  The encounter was a seizure and thus Bailey was entitled to the protections of the Fourth Amendment.

As there has been a seizure, the Fourth Amendment requires that the seizure be reasonable.  *United States v. Sharpe*, 470 U.S. 675, 682 (1985) (Fourth Amendment prohibits unreasonable seizures).   The existence of probable cause is required for formal arrests or seizures that resemble formal arrests to be reasonable.  *Gallegos*, 114 F.3d at 1028.  However, "[r]ecognizing that police officers must often act before probable cause can be determined, . . . the Supreme Court adopted an intermediate approach in *Terry* [*v. Ohio*, 392 U.S. 1 (1968)]," for an investigative detention or *"Terry* stop," which requires less than probable cause.  *United States v. Perdue*, 8 F.3d 1455, 1461 (10th Cir. 1993). Under such circumstances, a two-prong test is applied to determine the reasonableness of investigatory detentions.

First, the Court must decide if the detention was "justified at its inception." *United States v. Johnson*, 364 F.3d 1185, 1189 (10th Cir. 2004) (quoting *Terry*, 392 U.S. at 20).  The government "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." *Id*. (quoting *Terry*, 392 U.S. at 21).  "Those facts must tend to show that the detainee had committed or is about to commit a crime." *Id*.  "Neither 'inarticulate hunches' nor 'unparticularized suspicion' will suffice to justify an investigatory detention. *Gallegos*, 114 F.3d at 1028 (quoting *Terry*, 392 U.S. at 27).

Second, the officers' actions must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20; *Gallegos*, 114 F.3d at

1028; *Johnson*, 364 F.3d at 1189.

> *Terry* stops must be limited in scope to the justification for the stop.  Officers may
> ask the detained individual questions during the *Terry* stop in order to dispel or
> confirm their suspicions, "[b]ut the detainee is not obliged to respond."  Since
> police officers should not be required to take unnecessary risks in performing
> their duties, they are "authorized to take such steps as [are] reasonably necessary
> to protect their personal safety and to maintain the status quo during the course of
> [a *Terry*] stop."  An encounter between police and an individual which goes
> beyond the limits of a *Terry* stop, however, may be constitutionally justified only
> by probable cause or consent.

*Perdue*, 8 F.3d at 1462 (citations omitted).

"To determin[e] whether an investigatory stop is supported by reasonable suspicion,

courts must 'look at the totality of the circumstances of each case to see whether the detaining

officer has a particularized and objective basis for suspecting legal wrongdoing.' " *United States*

*v. Portillo-Portillo*,  2008 WL 538487 at * 4 (10th Cir.) (quoting *United States v. Arvizu*, 534

U.S. 266, 273 (2002) (internal quotations omitted).  Considering the totality of the

circumstances, the Court finds that the investigative detention of Bailey was not "justified at its

inception."   The only evidence regarding the reason for the encounter at 205 Mohawk was

Muse's testimony.  Muse testified that he had surveilled 205 Mohawk because it was known for

its narcotic sales and he had stopped two people conducting a hand-to-hand narcotics transaction

sometime in that time period.  While witnessing a hand-to-hand narcotics transaction in an area

known for narcotics sales would certainly justify stopping those two people, the only tie to

Bailey is that he was in the same general area measuring the roof of a house when the four patrol

cars pulled up with their sirens and lights on.  "An individual's presence in an area of expected

criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion

that the person is committing a crime." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000).   Nor

14

does including Muse's testimony that there was a group of 10-15 males in the parking lot adjoining the house create "reasonable suspicion" that Bailey "had committed or is about to commit a crime." *Terry*, 392 U.S. at 21.  Based on the testimony of Muse, Snow and Mahan, the Court found that Muse must have mistaken the number of males in the parking lot as Snow testified there were 4-5 males and Mahan testified there were 5-6 males.  And, in any case, the number of men congregating in the parking lot certainly does not create "reasonable suspicion" that Bailey, who is separated from them by the retaining wall and is working next door at the house, is involved in anything they may be doing. Given these facts, it is not surprising that the government has not argued there are "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant[ed] the intrusion."  *Terry*, 392 U.S. at 21.

In addition, Muse exceeded the scope of his pat-down search of Bailey.  The law permits officers to do a pat-down search during a *Terry* stop if they reasonably believe that a detainee may be armed and could gain immediate control of a weapon; in other words, "armed and dangerous." *Terry*, 392 U.S. at 30.  Muse testified that he patted down Bailey because the first thing he does in a high crime area is check for weapons.  However, the "'narrow scope' of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion *directed at the person to be frisked*, even though that person happens to be on premises where an authorized narcotics search is taking place." *Ybarra v. Illinois*, 444 U.S. 85, 94 (1979) (emphasis added); *United States v. Santillanes*, 848 F.2d 1103, 1108 (10th Cir. 1988).  Muse offered no basis to support a reasonable belief that Bailey specifically was armed.  Further, "[n]othing in *Terry* can be understood to allow a generalized 'cursory search for weapons' or, indeed any

15

search whatever for anything but weapons." *Ybarra*, 444 U.S. at 93-94; *Santillanes*, 848 F.2d at 1108.  And even if Muse had a reasonable belief that Bailey was armed, a bulging wallet cannot reasonably be mistaken for a weapon or provide any legal basis for Muse to put his hand in Bailey's pocket.  *Sibron v. New York*, 392 U.S. 40, 65 (1968) ("The search for weapons approved in Terry consisted solely of a limited patting of the outer clothing of the suspect for concealed objects which might be used as instruments of assault. Only when he discovered such objects did the officer in Terry place his hands in the pockets of the men he searched.").

The government, nonetheless, argues that even if the detention of Bailey were illegal, Bailey consented to the pat down and the search of his car. "The voluntariness of consent to search must be determined from the totality of the circumstances, and the government bears the burden of proof, without any presumption." *United States v. Nicholson*, 983 F.2d 983, 988 (10th Cir. 1993).  The government must show that there was no duress or coercion, express or implied, that the consent was unequivocal and specific, and that it was freely and intelligently given." *Id.* Thus, the two-step test to determine the voluntariness of the consent is:

> First, the government must proffer "clear and positive testimony that consent was unequivocal and specific and freely and intelligently given."  Furthermore, the government must prove that this consent was given without implied or express duress or coercion.

*United States  v. Angulo-Fernandez*,  53 F.3d 1177, 1180 (10th Cir.1995) (citations omitted).

There is no credible basis for the government's argument that Bailey consented to the pat down.  First, Muse did not testify that Bailey agreed to the pat down or to Muse removing his wallet from his pocket.   And, in any case, Muse's testimony actually belies any consent to the pat down as Muse restrained Bailey's hands during the pat down and pulled the wallet from Bailey's pocket.  Thus, the $4500 in currency was illegally obtained and is subject to the

16

exclusionary rule.

Although the only testimony pertaining to Bailey's consent is Muse's undisputed testimony that Bailey voluntarily consented to the search of his black Lexus, the diagram found therein must, nonetheless, also be excluded.[3]  When there has been a Fourth Amendment violation, "the government bears the heavy burden of showing that the primary taint of that violation was purged." *United States v. Caro*, 248 F.3d 1240, 1247 (10th Cir. 2001); *United States v. Reeves*, _ F.3d _, 2008 WL 1961246, *5 (10th Cir.) ( "When a consensual search is preceded by an unlawful [detention], the government must prove the consent was given voluntarily. It must also 'establish a break in the causal connection between the illegality and the evidence thereby obtained.'").   To satisfy this burden, "the government must prove, from the totality of the circumstances, a sufficient attenuation or 'break in the causal connection between the illegal detention and the consent.' " *United States v. Gregory*, 79 F.3d 973, 979 (10th Cir.1996) (quoting *United States v. McSwain*, 29 F.3d 558, 562 n. 2 (10th Cir. 1994).  The factors to consider under the totality of the circumstances test are: "(1) the temporal proximity of the illegal detention and consent, (2) any intervening circumstances, and (3) the purpose and flagrancy of any official misconduct."  *Caro*, 248 F.3d at 1247 (quoting *Gregory*, 79 F.3d at 979); *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975).

Although the government has argued that Bailey's consent to search the car was voluntary, it made no attempt to meet its burden to prove that the search was not an "exploitation" of the prior illegal detention. *United States v. Melendez-Garcia*, 28 F.3d 1046,

---

[3]  Both Snow and Mahan testified that they did not hear Muse's and Bailey's conversation.  And Bailey did not take the stand.

1054-55 (10th Cir. 1994).[4]   There was no lapse between the illegal detention and Bailey's

alleged consent to search his vehicle and no intervening circumstances.  Both of these factors

support a finding that there was no "break in the causal connection between the illegality and the

evidence thereby obtained."  *United States v. Fernandez*, 18 F.3d 874, 883 (10th Cir. 1994)

(quoting *United States v. Recalde*, 761 F.2d 1448, 1458 (10th Cir. 1985)). Further, the purpose

and flagrancy of Muse's conduct also weighs against a finding of voluntary consent.  Muse

offered no reason for the detention of Bailey other than Bailey approached him and engaged him

in conversation, telling him that he was doing construction work on the house.  The only reason

Muse gave for patting Bailey down for weapons was that it is the first thing he does in high

crime areas, a reason clearly lacking the requisite reasonable suspicion that Bailey was "armed

and dangerous."  And finally, even though there is no evidence that Muse thought Bailey's

bulging wallet was a weapon, Muse nonetheless removed the wallet from Bailey's pocket. For

these reasons, the Court also finds that Muse's conduct was "sufficiently egregious" that it

tainted any consent that Bailey may have given for the pat down or the search of his vehicle.

Because the Court finds that Bailey's Fourth Amendment rights were violated during

Muse's prior encounter with Bailey at 205 Mohawk, the Court sets aside and does not consider

the references to that encounter in determining whether Muse's affidavit establishes probable

---

[4] The Tenth Circuit in *Melendez-Garcia* explains the difference between the "voluntariness and fruits tests":

> While there is a sufficient overlap of the voluntariness and fruits tests that often a proper result may be reached by using either one independently, it is extremely important to understand that (I) the two tests are not identical, and (ii) consequently the evidence obtained by the purported consent should be held admissible only if it is determined that the consent was both voluntary and not an exploitation of the prior illegality.

*Melendez-Garcia*  28 F.3d at 1054 -1055 (quoting  LaFave, 3 Search and Seizure § 8.2(d) at 190).

cause for the search of Bailey's residence.

### C.    The veracity of the search warrant affidavit

Bailey alleges in essence that Muse, in his affidavit in support of the search warrant, made up the story about the informant, Witherspoon. Accordingly, he requested an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154 (1978).

As noted above, the Fourth Amendment Warrant Clause provides that "no warrants shall issue but upon probable cause, *support by Oath or affirmation*." U.S. amend. IV (emphasis added). Implicit in this is that the statements in the affidavit are true. Therefore, it is a violation of the Fourth Amendment to "knowingly and intentionally, or with reckless disregard for the truth," include false statements in a search warrant affidavit. *Franks*, 438 U.S. at 155.

Under *Franks*, a defendant may request an evidentiary hearing regarding the veracity of a search warrant affidavit. *Id*. at 171-72. To be entitled to a *Franks* hearing, the defendant must allege that the search warrant affidavit contains deliberate falsehood or reckless disregard for the truth, and the allegations must be accompanied by an offer of proof - "[a]ffidavits or sworn or otherwise reliable statements of witnesses" - or their absence explained. *Id*. at 171. The government objects that Bailey failed to meet the pre-hearing requirement of an affidavit supporting his allegation of falsehoods. Bailey contends that he established a preliminary showing as required under *Franks* of either false statements within the affidavit or statements made in reckless disregard of the truth based on the following:

> (1) There is no statement as to the reliability or credibility of
> Witherspoon who has had eleven previous drug-related arrests;
> (2) Bailey will put on evidence that Witherspoon has stated on
> several occasions subsequent to the search that she had no contact
> with officers as it related to Bailey, was not questioned about him
> by officers, and does not know Bailey and has never been inside

19

his house;
(3) Although the affidavit states that Witherspoon witnessed
"Pooh" purchase a quarter ounce of crack cocaine from "Ojo" on
November 24, 2007 at 6:00 PM, Bailey will prove that he was at
Club Fahrenheit, opening it for manager Elgin Scott who was out
of town for the Thanksgiving holiday.

None of these vitiates the requirement of an affidavit in support of a motion for a *Franks*

hearing.  First, the search warrant affidavit need not discuss the reliability of an informant when

the information is corroborated by other independent information.  *United States v. Avery*, 295

F.3d 1158, 1167 (10th Cir. 2002).  And statements about what the defendant *will* prove is no

substitute for an affidavit of a witness who attests to the actual falsehoods.  However, as the

defendant's counsel had difficulty obtaining a sworn statement from Witherspoon because she

was residing in a court-ordered half-way house and there were other issues to consider at the

hearing, the Court agreed to hear evidence on the *Franks* challenge as well.

To establish a *Franks* violation, the defendant must establish by a preponderance of the

evidence that the search warrant affidavit contains intentional or reckless false statement(s) and

that the affidavit, purged of its falsities, would not be sufficient to establish probable cause for

the search.  *United States v. Kennedy*, 131 F.3d 1371, 1376 (10th Cir. 1997); *Avery*, 293 F.3d at

1166-67.

Muse's search warrant affidavit states the following regarding Witherspoon:

YOUR AFFIANT FURTHER STATES THAT OFFICERS WITH THE TULSA
POLICE DEPARTMENT CAME INTO CONTACT WITH FELICIA
WITHERSPOON.  WITHERSPOON HAS ELEVEN PREVIOUS DRUG
ARREST [SIC] IN THE CITY OF TULSA.  WITHERSPOON TOLD ME THAT
SHE WAS AT 2304 NORTH BOSTON PLACE WITHIN THE LAST 72
HOURS, AND WATCHED A LIGHT SKINNED BLACK MALE SHE KNOWS
AS "OJO" SELL WHAT SHE TOLD ME WAS A QUARTER OF AN OUNCE
OF CRACK COCAINE TO A MAN SHE KNEW AS "POOH".  SHE TOLD ME
THAT SHE KNOW THAT A QUARTER OUNCE WEIGHS

20

APPROXIMATELY 7 GRAMS.  SHE SAID "POOH" THEN SOLD HER A "ROCK" OF CRACK COCAINE FROM THE SACK SHE SAW HIM BUY FROM "OJO", AND SHE SMOKED IT WITH "POOH".  WITHERSPOON HAD KNOWLEDGE ON THE SALE AND DISTRIBUTION OF CRACK COCAINE, AND THOROUGHLY CONVINCED YOUR AFFIANT ON HER KNOWLEDGE OF IT, ITS PACKAGING, ITS WEIGHING, ITS DISTRIBUTION, AND ITS USE.  WITHERSPOON THEN RELAYED THE FOLLOWING:

- THAT SHE HAS BEEN GOING TO 2304 NORTH BOSTON PLACE WITH "POOH" FOR SEVERAL MONTHS FOR THE PURCHASE OF CRACK COCAINE.
- THAT SHE SAW "POOH" PURCHASE THE CRACK COCAINE FROM A LIGHT SKINNED BLACK MALE SHE KNEW AS "OJO".
- THAT "OJO" IS AROUND 5 FEET 10 INCHES TALL, LIGHT SKINNED, AND WEIGHED AROUND 160-180 POUNDS WITH LONG BLACK BRAIDED HAIR.
- THAT "OJO" LIVES AT THIS RESIDENCE WHERE HE DISTRIBUTES CRACK COCAINE.
- THAT THIS RESIDENCE IS CONSTRUCTED OF BRICK, WITH A WOODEN FENCE AROUND THE SOUTH AND BACKSIDE OF THE RESIDENCE.
- THAT SHE HAS BEEN TO THIS RESIDENCE SEVERAL TIMES IN THE PAST MONTH WITH "POOH", AND WATCHED HIM PURCHASE CRACK COCAINE.
- THAT SHE BUYS A SMALL PORTION OF THE CRACK COCAINE FROM "POOH" AFTER EACH VISIT.
- THAT "POOH" CUTS THE LARGER ROCKS INTO SMALLER ROCKS, AND THEN SELLS THEM INDIVIDUALLY ON THE EAST SIDE OF TULSA IN AN APARTMENT COMPLEX IN THE AREA OF 10800 EAST 31st STREET.
- THAT SHE PERSONALLY WATCHES "OJO" SELL CRACK COCAINE TO "POOH" EACH TIME THEY VISIT.
- THAT "OJO" SELLS "POOH" AROUND A QUARTER OUNCE OF CRACK COCAINE ON EACH VISIT.
- THAT ON 112407 AT 1800 HOURS SHE RODE WITH "POOH" TO THE RESIDENCE, AND WATCHED HIM BUY APPROXIMATELY A QUARTER OUNCE OF CRACK COCAINE.
- WITHERSPOON TOLD ME THAT EVERYTIME SHE HAS STOPPED AT THE HOUSE WITH "POOH", "OJO" ALWAYS HAS CRACK COCAINE.  THIS INCLUDES WHEN THEY SHOWED UP UNANNOUNCED.

WITHERSPOON THEN DROVE OFFICERS TO 2304 NORTH BOSTON PLACE, AND POINTED TO A HOUSE WITH TAN BRICK AND A BROWN SHINGLE ROOF.

Def. Ex. 2.

At the hearing, Witherspoon testified that the above was "a lie."  She testified that although she knew of Ojo because he used to work at a convenience store she frequented, she had never been to his house, never been to 2304 N. Boston Pl., and never saw him sell crack cocaine. Witherspoon testified that she met Pooh around five years ago but had not been in a car with him in five years and was not with him on November 24, 2007 and did not recall being with him any time over that Thanksgiving weekend; she was not with Pooh when he allegedly purchased drugs from someone at 2304 N. Boston Pl.; she only bought marijuana from Pooh; and never saw Pooh purchase drugs from Bailey.  Witherspoon denied that she was picked up or had any contact with police around November 24 or 25, 2007, that she said any of the above to police, that she knew or talked to Muse or Snow, and that she rode with them and directed them to and pointed out Ojo's house.  Witherspoon admitted that she had been arrested eleven times for possession of drugs, had a crack pipe and purchased crack cocaine "off the street," paying $20 a rock.  She testified that she was probably somewhere smoking crack on November 24, 2007 at 6:00 PM because she was using a lot that day, but even if she were high she would know if she had an encounter with the police as she had an outstanding warrant for her arrest.  Finally, Witherspoon testified that Bailey's state court attorney, Larry Edwards, met with her when she was in jail and later she met with Bailey's current attorney, Stan Monroe, and when they each showed her Muse's affidavit she told each of them it was a lie.

Larry Edwards confirmed that he visited Witherspoon while she was in custody for charges brought against her in Tulsa County drug court and she told him that she never acted as an informant for law enforcement, had never been to Melvin "Ojo" Louis Bailey, Jr.'s house, had

never witnessed drug sales and/or distribution at 2304 N. Boston Pl., and the alleged statements by her to an officer as stated in the affidavit for search warrant are wholly not true and she never made such statements to anyone, including law enforcement.

Muse testified that his affidavit accurately reflected what Witherspoon told him when he and Snow picked up Witherspoon on November 24, 2007 at 6:00 PM.  He added that they picked Witherspoon up while she walking at Virgin and Cincinnati; she appeared nervous as she had a crack pipe and baggie with powder residue; Muse did not field test the baggie, but used the baggie to bluff Witherspoon so that she would give them information; Muse verified that she had an outstanding misdemeanor warrant, did not make any promises to her, knew she had a life-long problem with drugs, asked where she purchased her last rock, tried to get information about Pooh, and told her he would name her as an informant on the search warrant.  Muse also testified the following about his notes from this encounter with Witherspoon: Witherspoon described Ojo as in his mid-late 30s, light-skinned with braided long hair and his house as located around Cincinnati and Young, red brick with a wood fence and a bunch of cars.  Muse acknowledged that Muse's house was located at the intersection of Boston Place and Xyler, and the house was not red brick but tan stucco.  Muse also took the following notes about Pooh: he was a black male, 27-30 years old, drove a blue Buick Century and sold narcotics around 31st & Mingo.  Muse also testified that Witherspoon directed them to Bailey's residence at 2304 N. Boston Pl., although Muse attempted to go in the wrong direction several times, and pointed out Bailey's house.

Snow confirmed that he was present with Muse when Witherspoon was interrogated, that Witherspoon described the person who was the source of Pooh's crack cocaine purchase (and

23

Snow suspected that Bailey was the person she described), and that Witherspoon gave directions to Ojo's house and pointed out the house at 2304 N. Boston Pl.

The following, however, are inconsistencies between Muse's affidavit and the evidence at the hearing.  (1) Muse testified that he and Snow picked up Witherspoon on November 24, 2007 at 6:00 PM; yet the affidavit states that Witherspoon was with Pooh at that time watching him buy crack cocaine from Bailey at his house.  Indeed, it seems that Bailey was omnipresent the evening of November 24, 2007.  Elgin Scott testified that he saw Bailey at Club Fahrenheit around 7:00 PM on November 24, 2007; Tiara Crawford testified that November 24th was her birthday and Bailey spent most of the day and evening with her and took her to dinner at the Cheesecake Factory around 7:00 in the evening; and Brian Breman, a very credible witness, testified that Bailey was purchasing liquor for Club Fahrenheit around 6:00 PM on November 24, 2007 and identified a Parkhill Liquors and Wines invoice dated 11/24/07 at 18:04 as reflecting Bailey's purchase.  (2) Muse stated in his affidavit that "A UTILITIES CHECK OF 2304 NORTH BOSTON PLACE SHOWED GENEVIEVE BAILEY IS LISTED AS THE PERSON RESPONSIBLE FOR THE BILLS," yet Genevieve Bailey testified that only the water bill and land telephone line are in her name; Bailey's name is on the gas and electric.  (3) Muse attested in his affidavit that "WITHIN THE PAST 72 HOURS [MUSE] AND OTHER OFFICERS CONDUCTED SURVEILLANCE ON 2305 NORTH BOSTON PLACE.  IT REVEALED FREQUENT OUT OF STATE (TEXAS) VEHICULAR TRAFFIC ARRIVE, APPROACH THE RESIDENCE AFTER BEING LET INSIDE BY MELVIN BAILEY JUNIOR, AND THEN LEAVE A FEW MINUTES LATER," yet Muse admitted that he surveilled the house from a distance and could not see faces.  Therefore, he did not see, but

24

merely assumed that it was Bailey letting people inside.

Having considered the evidence and testimony presented at the hearing and judged the credibility of the witnesses, the Court finds Witherspoon's testimony at the hearing implausible. At best, she may have been so high from smoking crack cocaine when she was picked up by Muse and Snow that she was unaware of or forgot what transpired.  But, as Larry Edwards characterized his impression of her denial that she was an informant, she had "reasons to tell the truth and reasons to lie."  As for the above inconsistences between Muse's testimony and his affidavit, clearly there is a problem with November 24, 2007 being the date Witherspoon allegedly witnessed Pooh purchase crack cocaine from Bailey at his residence, but Bailey has failed to show by a preponderance of the evidence that the error is intentionally and recklessly false.[5]  Although the statement regarding Genevieve Bailey paying the bills for the utilities at Bailey's house is too broad, it also does not rise to the level of an intentional or reckless false statement.  The statement that Muse observed people "APPROACH THE RESIDENCE <u>AFTER BEING LET INSIDE BY MELVIN BAILEY JUNIOR</u>," however, is a reckless false statement. Yet, the Court finds that the statement, if purged, would not undermine Judge Smith's probable cause determination such that it could no longer be said to have a substantial basis.

In sum, without consideration of the prior encounter at 205 Mohawk or the statement identifying Bailey as the person who allowed suspected drug dealers inside his house, the Court finds, under the totality of the circumstances presented in Muse's affidavit, that Judge Smith had a "substantial basis" for determining that there was probable cause to search 2304 N. Boston

---

[5] The log of TRACIS inquiries on Witherspoon reveals that an inquiry was run on November 25, 2007 at 5:02 PM from Muse's laptop.

Place.

### III.   Staleness

Bailey contends that even if the affidavit contains probable cause for the search of his residence, the information in the affidavit is stale as the search warrant was not executed until eight days after it was issued.

"Probable cause to search cannot be based on stale information that no longer suggests that the items sought will be found in the place to be searched." *United States v. Snow*, 919 F.2d 1458, 1459 (10th Cir.1990). "However, the determination of whether information is stale depends on the nature of the crime and the length of criminal activity, not simply the number of days that have elapsed between the facts relied upon and the issuance of the warrant." *United States v. Myers,* 106 F.3d 936, 939 (10th Cir.1997) (concluding gap of five months between tip and search warrant did not render information stale when drug activities were demonstrated to be continuous and ongoing). "[T]he passage of time becomes less significant when the criminal offense is continuous." *United States v. Miles*, 772 F.2d 613, 616 (10th Cir.1985).

The facts alleged in the affidavit state that Bailey was selling crack cocaine from his house on an ongoing basis for at least "several months" preceding November 24, 2007, and that every time Witherspoon stopped by Bailey's house with Pooh, even when unannounced, Bailey "always" had crack cocaine.  As the affidavit contains facts demonstrating that Bailey's alleged drug trafficking was continuous and ongoing for over several months, the Court finds that the passage of time from November 24, 2007 to the execution of the search warrant on December 4, 2007 did not render the information stale.

**IV.    Recommendation and Objections**

For the reasons stated above, the Court recommends that Bailey's Motion to Suppress Evidence (Dkt. #15) be **DENIED**.

The District Judge assigned to this case will conduct a de novo review of the record and determine whether to adopt or revise this Report and Recommendation or whether to recommit the matter to the undersigned.  As part of his review of the record, the District Judge will consider the parties' written objections to this Report and Recommendation.  A party wishing to file objections to this Report and Recommendation must do so on or before **May 27, 2008.**  See 28 U.S.C. § 636(b)(1) and Fed.R.Crim.P. 59(b).  The failure to file written objections to this Report and Recommendation "waives a party's right to review." Fed.R.Crim.P. 59(b).

Dated this 16th day of May, 2008.

Paul J. Cleary
United States Magistrate Judge

27